518-052B, Kerry Hootens v. The Workers' Compensation Commission You may proceed. May the peace of the court be with you. My name is Mary Massa. I'm the representative petitioner for Kerry Hooten's case. The arbitrator's decision was affirmed by the Commissioner of the Art in this case, with a dissent from Commissioner Gore. The relevant facts to be perceived in this incident case have to do with a couple of more count cases that my client filed back in 2010 and 2011. The 2010 claim was for repetitive injury to the cervical spine. The 2011 claim had to do with injury to the left shoulder. The 2000, the neck claim was settled in July of 12, and the shoulder claim was settled in December of 2012. Now, the arbitrator, the Commission, during this case, found that my client did not prove the arising out of and the causation elements of his burden of proof. The first reason for that, or rationale for that decision, was a finding that my client waived any right to bring a claim to repetitive injury to the cervical spine in this incident claim because of the settlement he made on the two cases back in 2012. And that waiver, I think, is, that waiver issue is a contract interpretation matter. And according to both contracts, it referred to the settlement being based on the petitioner's present condition. Now, the arbitrator made a note, and of course the Commission, the majority made a note, that my client said that when he was finally released to return to full New York, which was sometime in the summer of 2012, after the neck surgery in 2011 and the shoulder surgery in 2012, my client said he still, he wasn't pain-free, but he was a whole lot better than he was prior to the first two surgeries. And both Dr. Poulos, the neck surgeon, and Dr. Dusik, the shoulder surgeon, released my client to work full duty without restrictions. What does that have to do with the settlement? The settlement says present condition, and in that particular case... Wait, wait, wait. Let me ask you something. Let me stop you there. The settlement again provides a claimant wages right to any additional medical treatment for the results of his cervical spine or left shoulder injuries and any additional benefits if his condition worsens as a result. So they contemplated that even if, you know, he began to have residual problems, it would be barred by the settlement. Well, Your Honor, I think you have to look at what levels of the cervical spine were at issue in the earlier workman case, and that was C5-6 and C6-7. As per the MRI that was performed in May of 2010, those two levels of the spine had significant degenerative changes and changes that were causing the symptoms that my client had at that point in time. So it was a fusion, right, at those C5 and C6. Correct. And so now are you saying that the present injury condition of ill-being is not at C5 and C6? I'm saying that the predominant area of the cervical spine that is causing my client's symptoms in this case and which is the proposed surgery in this case is the level at C4-5. So there is C5 involvement? C4-5, which is different than C5-6 and C6-7 in terms of fusion. Didn't Gornett opine that his neck pathology at C4-5 would have occurred independent of his work activities and that the 211 fusion from C5 to C7 caused deterioration of the disc pathology at C4-5 and resulted in the failed fusion at C6-C7? Isn't that what he testified to? Dr. Gornett did testify about it. So why can't the Commission believe him? Dr. Kort and Gornett did testify that with fusions, there is a phenomenon, if you will, called adjacent segment degeneration, and that can happen either above or below the construct of the prior fusion. But in terms of the burden of truth in an aggravation of a pre-existing condition case, Your Honor, the burden of truth considers whether or not the work activities were also a cause and resulted in the condition in real being. Well, let's go back to this waiver and look at the language of the waiver. Assume Gornett is correct, okay? Because Gornett says, I don't do those things anymore. I do disc replacements. That's the modern quote thing with fewer residual negative outcomes. Would not that waiver encompass what Gornett is saying, that he's waived all of this subsequent, even though the fusion had this effect on a different part of the cervical spine? Let's look at the MRI from back in 2010. C3? No, I don't think we need to look at that. We don't need to look at that. We're asking about the waiver. Does the waiver cover the condition of ill being now? Our position, Your Honor. Assuming Gornett's analysis is correct. That there's always a possibility that an adjacent level can have degeneration. That would have to be a sole cause. I think you're conflating the two of them. Generally speaking, you're absolutely 100% spot on. Be compensable under the act. The injury does not have to be the sole or the only cause of the condition of ill being. But this language here in this release says this. Any additional benefits resulting from the cervical spine and shoulder injury, even if the condition worsens. So by that very language, if this aggravates, it's still aggravating the same area where the surgery is on, and the release contemplated that. You're saying anything connected to or relating to the injuries that he was originally receiving surgery for is barred. Otherwise, what do you make by the terms, if his condition worsens as a result of the injuries? By that language, Your Honor, I believe it's limited to the two areas of the cervical spine that were the subject of the fusion surgery. And Gornett gives him the opinion he wants. It connects it up, does it not? He says that that can be a sequelae of a fusion. But let's say in a couple more years, my client's level 2-3, which was totally normal in 2010, or level 3-4, which was totally normal in 2010. Let's say he starts having degeneration in those levels. Should this release from this particular case, which only involves surgery at the lower levels, 5-6 or 6-7, Wait a minute, wait a minute, wait a minute. You're missing something. You're missing something. If the subsequent injury is related to or caused by a failure of the prior surgery, then it is covered by the release. If, on the other hand, it is totally independent, then in that particular case he has a right to recover. What the commission found in this particular case, I guess, that the current condition of ill-being, the degeneration at C-4-5 causing the pain, stemmed from the 2011 fusion at C-5-C-6 and C-6-C-7, and that the current condition of ill-being is not a new injury causally related to his work, and rather it was a worsening of the cervical spine from a previous work injury. Now, Dr. Oboinik, is that his name? What did he have to say about this? He believed, based upon my client's work activities, that they would be a causal factor in the degeneration at C-4-5, necessitating the surgery that he believed. Did he also opine that the source of the bilateral shoulder pain was C-4-5 level of the cervical spine, and that his current condition at C-4-5 could have developed through normal degeneration and contribution from the 2011 fusion, regardless of the type of work he did? Your Honor, he did say that any adjacent level segment, that being C-4-5, could degenerate solely outside of the work activity. So you've got Gornett saying work activity had nothing to do with it, it was all as a result of a worsening condition caused by the prior fusion. And you've got O'Boyle saying, I don't believe that, but the C-4-5 could have developed through normal degeneration and contribution from the fusion. The only thing they disagree with is there's a causal relationship. Could have developed, but under the standard of proof under a CISPRO patient, Your Honor, if the work activities could also be shown as a cause in this degeneration at that level, as Dr. O'Bornett testified, then my client has made a conclusion. Yes, well then the question is, under CISPRO, who makes the decision whether it did or did not? It's the Commission. And the Commission found that Gornett was correct. It did not, as opposed to Boynik's opinion. There's no question under CISPRO, if the Commission had found in favor of Boynik's opinion, you win. And my position, Your Honor, petitioner's position in this case, is that that finding was against the manifesto idea? Okay, well, that's not our intent. You don't ignore the release. You've got to analyze this case in terms of the release. The hypothetical you set up, if he develops problems in other areas of his spine, is it going to be barred? The answer is probably not, unless you've got medical testimony to establish, again, it was related to the original surgery. You've got Gornett clearly saying it was, right? Boynik is somewhat contrary to that, but he also tacitly acknowledges that it could have been related. How is that against the manifesto idea? Who's saying it was not related? Well, if you look at the medical records and evidence from the prior Wilcox case, predominantly it was... But we're not the doctors. How do we look at the medical evidence? We look at the testimony. Is there evidence in the medical records of Dr. Poulos, who was the surgeon in that case, that C4-5 was at all involved? No. In fact, the MRI that was done showed that he had some minimal degenerative changes at that point. And, in fact, the C4-5 symptoms that Dr. Boynik testified my client had proof of from that nerve root block at C5 is the same as the symptoms that he was having. He was having symptoms in his left shoulder as well as his right shoulder, which was a different symptom presentation that my client had back in the earlier days. How do we avoid the effect of Gornett's testimony? Who looked at the medical records, looked at the CT scans, he looked at everything and said, you know, this is connected up to the earlier surgery. And he also acknowledged that the symptoms that my client testified that he had when he was doing overhead work as part of his job duties very well could have caused the exact same symptoms that he was having. But there's a difference between him saying it could have and his opining that it did. So, in other words, he opined it did not. And he also testified that he recommends that his patients don't do overhead work. Well, I understand that. But the fact of the matter is, just because a doctor says, yeah, this could do it, but in my opinion you didn't, so why can't the commission believe the it didn't part as opposed to relying on it could to award the benefits? Or the commission could turn around and say, we agree with the could part and we're going to award the benefits and we're back to the same position. There's no right answer when we're talking about the choice that the commission makes on which expert to believe. If you're looking at the credibility of the two experts, I think you also have to look at the words of Commissioner Gore in this case, who said, the employee returned to work for a period of two and a half years without restrictions, doing the same job that he used to do before the original work complaints, and he had no problems until October of 2014 when he started developing right shoulder complaints. Your Honor, it's because of the different presentation in this particular case that I think it differentiates itself from the condition that was at issue in the 2011 notice. Nonetheless, you have to acknowledge the law is well settled. We can't substitute our judgment for that of the commission on credibility in the way that the medical evidence. That's within their sole province. Your Honor, you are correct. In my brief, I've set forth how I believe that the opinion of Dr. Gornad is speculative in many ways as well as it's against the medical standard. Thank you. Do you all have time? If not, I'm going to close. Counsel may respond. Thank you, Your Honor. May it please the Court, Ms. Mansa. My name is Jim Keith, and I represent Empire in this case. I think your questions were right on point that this is a medical issue, and there is a basis in the record to support the commission's determination to pick Dr. Gornad over Dr. Avoy. First off, he looked at the 2010 MRI before Dr. Poulos' surgery, and while Dr. Poulos did not operate the C45 level, he said there wasn't disc herniation there, number one. Number two, while after being released by Dr. Poulos, the employee did perform his regular job activities, he admitted to me in a cross-examination that his neck pain never went all the way away. He still had symptoms into the shoulder. And Dr. Gornad even said that after Dr. Poulos released this employee and he treated with Dr. Butek for an independent shoulder issue, that a portion of those shoulder symptoms were more likely than not actually coming from the neck and probably the C45 level. So those findings in and of themselves are enough for the commission or to support the commission's determination that Dr. Gornad is dependent, was more persuasive, and better founded than Dr. Avoy. How does that specifically tie into the release, which reportedly bars recovery from the subsequent aggravation related to the original injury and surgery? I think in two ways. The first has to do with the job activities itself. So it was Avoy's testimony that if he did these job activities for, say, 30-plus years, then those job activities could be a contributing factor to the cervical spine. When you look at the settlement contract, it settled any and all claims, all claims to date, aggravations, re-injuries, Worsening, worsening was the language too. Worsening to the cervical spine up until the date of that contract. So when you start looking at job activities and how much you have to do with them to get to causation, you're starting from the day after that contract was approved or right after that contract was approved. You're not looking at 30-something years. And then number two, medically, as Dr. Gornad said, two years is just not enough to get to an aggravation of a C4-5 level, particularly when you look at the C5-6 and C6-7 fusions. It in and of itself explains why the C4-5 level was now symptomatic and was going to require treatment. Okay, Gornad said C4-5 actually needed treatment in 2010. Dr. Poole should have treated it at that time. Now, he didn't, but again, the commission chose to believe Dr. Gornad, and he had very valid basis for that opinion, and it turned out he was right. Because the guy said, I never got all the way better, and even when he was seeing Dr. Dusek for the independent shoulder issue, Gornad said, what? This person's support is likely, and some of that is coming from C4-5 anyway. So here, this is just a straight-out of a question where Gornad had a better foundation, a better basis for reaching this conclusion. There's support in the record for it, and so that's why we asked the commission to consider the referral. Thank you, Counselor. Counselor, you may reply. Okay. The 2010 MRI at C4-5 showed minimal disc health, disc high-density, minimal disc bulge. This is supposed to be an herniated disc that my client had back in 2010 that Dr. Gornad said should have been treated. I mean, if you look at the symptoms that my client had when he first started treating with Dr. Kuhlholz back in 2010, he had neck pain that radiated into his left shoulder and down the back and side of his left arm. Totally different symptom presentation in 2015 when my client went to see Dr. O'Gornick. And you can't just look at the two-year period after the contract interpretation to have a snapshot of what my client's baseline was at that point. Yes, he did have a preexisting condition at C4-5, one that, according to the medical records, there's no evidence that he had any complaints that warranted any surgical treatment, as did the C5-6 and the C6-7 levels that Dr. Kuhlholz did operate on back in 2011. And Dr. O'Gornick's testimony, which the arbitrator did not find to be as credible as Dr. Gornad, was presented with a hypothetical. And based on that hypothetical, which had to do with my client doing overhead work, testified that my client would have flexion and extension of his neck. Now, my client testified that one of the biggest pain producers of part of his job was this paint job, where he would take parts of stoves, hook them onto a chain above his head. Now, unless my client had eyes on the top of his head, he's going to be looking back. And he's going to have to get parts to put... other parts to put up. If you're doing overhead work, your neck is going to be back. And Dr. O'Gornick said that is going to close off the foraminal space and cause the further degeneration. And that was the basis of his... one of the bases of his opinion. Now, the arbitrator said, that's not... In the edit, there's no foundation in the evidence. But my client did testify quite a bit about doing the overhead work. He also repeated that when he went to see Dr. Dusick and also when he went to see Dr. O'Gornick. So, I think Dr. O'Gornick's testimony was couched in the evidence. It did have foundation in the evidence. And I think the arbitrator was wrong on that front. I see that my time has ended. Well, until the red light. Oh, I'm sorry. That's the warning. That's only the warning. If you still enter the intersection until it turns red, then you can't enter. The caution sign. Yes. Okay. So, in terms of what we'd like the commission... excuse me, the court to do in this case is to reverse the decision of February 7, 2018 by the commission majority on the issues of accident and causation. And we would like you to consider making a warrant under Section 19F2, your authority under that section of the Act, for my client's medical bills and the prospective medical treatment that was recommended by Dr. O'Gornick. Okay. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement. A written disposition will issue it.